UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAISIIN BETHEA, FREDDIE GONZALEZ, JASON GUISHARD, OMAR HARRIS, ALEX MASS, and RODNEY VANTERPOOL, individually,<br><br>          Plaintiffs,<br><br>   -against-<br><br>EQUINOX FITNESS CLUB, EQUINOX HOLDINGS, INC., THE EQUINOX GROUP, INC, EQUINOX COLUMBUS CENTRE, INC., BROADWAY EQUINOX, INC., EQUINOX 63RD STREET, INC., EQUINOX WALL STREET, INC., EQUINOX GREENWICH AVENUE, INC., EQUINOX TRIBECA INC., DENISE BERG,<br><br>          Defendants. | Index No. 07- CV-2018<br><br><br><br><br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' LOCAL RULE 56.1 STATEMENT AND THEIR COUNTERSTATEMENT OF MATERIAL FACTS** |

Plaintiffs, by their attorneys, as and for their responsive Local Rule 56.1

Statement and Counterstatement of Material Facts, set forth the following:

1.      Undisputed.

2.      Undisputed.

3.      Undisputed.

4.      Undisputed.

5.      Undisputed.

6.      Undisputed.

7.      Undisputed.

8.      Undisputed.

9.      Undisputed.

10.     Undisputed.

11.     Undisputed.

12.     Plaintiffs do not dispute that the membership agreement (Exhibit L to Affidavit of Allan Bloom, sworn to November 13, 2007 ("Bloom Aff.") states as is claimed, but dispute **when** such agreement contained such language. Defendants **did not know** when the referenced language became part of the membership agreement.  See deposition transcripts of Matthew Herbert ("Herbert Dep.") at 172:24 – 173:4, Exhibit 3 to Kurshan Decl., and Denise Berg ("Berg Dep.") at 243: 14-17, Exhibit 10 to Kurshan Decl.

13.     Plaintiffs do not dispute that defendants cancelled members set forth in Exhibit N to Bloom Aff., but dispute that there were also members caught engaging in sexual activities but not cancelled and/or reinstated. See Kurshan Decl. at Exhibit 6, Gonzalez Dep. at 60:6 – 61:20.

14.     Undisputed.

15.     Undisputed.

16.     Disputed. Plaintiff Mass brought members to the front 50 times. Mass Dep. at 309:22-25.  Mass complained about and saw inappropriate sexual activities every day.  See Mass Trans at 306:25 -306:7, Exhibit 1 to Kurshan Decl.

17.     Disputed. Plaintiff Mass **thought** that Equinox cancelled 20 memberships based on his complaints.  *Id.* at Mass Trans. at 295:17-20, to Bloom Aff.

18.     Undisputed.

19.     Undisputed.

20.     Undisputed.

21.     Undisputed.

22.     Undisputed.

23.     Disputed. Plaintiff Bethea resigned because he could no longer work with the ongoing sexual activities as they were too degrading and disrespectful. Bethea Trans. at 123:25 - 124:5, Exhibit 8 to Kurshan Decl.

24.     Undisputed.

25.     Undisputed.

26.     Undisputed.

27.     Undisputed as to the referenced testimony of plaintiff Gonzalez but disputed that such inappropriate sexual activity was all the sexual activity that he observed. See Gonzalez Trans at 32:24 – 33:6; 35: 15 – 36:7; 45:8-18; 63:9-13;70:8 – 71:14; 74:25 – 76:11; 81:8-12, Exhibit 6 to Kurshan Decl..

28.     Undisputed that plaintiff Gonzalez resigned in May 2005 but disputed as to reasons for his resignation as such resignation was caused by his not being able to continue with the ongoing sexual activities. *Id.* at 101:4-8.

29.     Undisputed.

30.     Undisputed.

31.     Undisputed.

32.     Undisputed that plaintiff Guishard resigned from Equinox but disputed as to the reasons as he resigned because he could no longer work while inappropriate sexual activities were taking place. Guishard Dep., Exhibit 7 to Kurshan Decl. at 88:20 – 89:3.

33.     Undisputed.

34.     Undisputed.

35.     Undisputed.

36.     Undisputed that plaintiff Harris complained to plaintiff Mass but it disputed as he also complained to defendant Berg. Harris Trans at 36:16-24, Exhibit 9 to Kurshan Decl.

37.     Undisputed.

38.     Undisputed.

39.     Undisputed.

40.     Undisputed.

41.     Undisputed.

42.     Undisputed.

43.     Undisputed.

44.     Plaintiff Vanterpool complained to his supervisor at the 63RD Street location approximately three times per week about sexual activities going on in the bathroom. (Dep. R. Vanterpool ("Vanterpool Dep."), 37:7-38:4, Exhibit 5 to Kurshan Decl.).

45.     When plaintiff Vanterpool complained about the sexual activities, Mr. Rivera, his supervisor, said that he would tell the General Manager of the 63RD Street location, and that "they'll solve the problems." (*Id.* at 37:16-24).

46.     When plaintiff Vanterpool's supervisor George Rivera was not present, he complained to the General Manager of the 63RD Street location about the sexual activities going on in the bathroom. (*Id.* at 38:5-8).

47.     When plaintiff Rodney Vanterpool's supervisor, George Rivera, left the 63RD Street location, he reported to a new supervisor, Dan Rodriguez. *Id.* at

38:21-39:10.  He complained to Mr. Rodriguez approximately three or four times per week about the sexual activities going on in the men's locker room. *Id.* at 39:18-24.

48.     Plaintiff Vanterpool told Mr. Rodriguez that he witnessed men masturbating in the steam room.  *Id.* at 39:25-40:3.  When plaintiff complained to his supervisor, Dan Rodriguez, about the sexual activities, Mr. Rodriguez told plaintiff that he would tell the GM, and that "they'll resolve it." *Id.* at 40:4-8.

49.     Plaintiff Vanterpool complained frequently to his supervisor at the Greenwich location, George Smith, about the sexual activities going on in the locker room. (*Id.* at 41:16-42:15).  He told Mr. Smith that he saw guys "lotioning each other, groping each other, groping each other, talking about sexual orgies [and] masturbating." *Id.* at 42:6-10).  He also told Mr. Smith that he was "cleaning up feces, blood, finding condoms, [and] dildos." *Id.* at 42:11-12.

50.     When plaintiff Vanterpool complained to his supervisor, George Smith, about the sexual activities, Mr. Smith told plaintiff that "he'll take care of it." (Id at 42:13-17).  After plaintiff Vanterpool continued to see the same members doing the same activities everyday, he went back to Mr. Smith to complain. *Id.* at 42:18-22.  Mr. Smith response to plaintiff was again, "he'll take care of it." *Id.* at 42:21-43:4, see also 65:5-69:9.

51.     Plaintiff Vanterpool also witnessed a non-member come into the Greenwich location and masturbate in front of a mirror at least seven times within one month. (*Id.* at 73:14-75:13)  Mr. Smith "finally confronted him and threw him out of the club." *Id.* at 73:14-76:3.  After Mr. Smith threw the individual out of the club, the same individual "always found his way back inside the club." *Id.*

52.     Plaintiff Vanterpool witnessed masturbation occurring inside of the men's locker room and steam room every day he went to work at the Greenwich location, and he complained such behaviors at least three or four times per week to Mr. Smith. (*Id.* at 82:19-83:3).

53.     Plaintiff Vanterpool was compelled by management to act as a security guard for the steam room, which resulted in his exposure to explicit sexual activities on a daily basis. (*Id.* at 85:8-86:15).  As a result of the explicit sexual activities that were occurring in the men's locker rooms, plaintiff was forced to clean up the "mess" which included "the feces, the blood, [and] the semen on walls" three times per day "because of the foul odor." *Id.* at 85:13-22.

54.     Plaintiff Freddie Gonzalez complained to his supervisor at the 63RD Street location, Danny Rodriguez, about the sex occurring in the club, but the sex continued. (Dep. F. Gonzalez, 33:2-15 ("Gonzalez Dep."), excerpts from which are annexed to the Kurshan Decl. as Exhibit 6).  When plaintiff complained, Mr. Rodriguez's response was "he would take care of it." *Id.*

55.     Plaintiff Gonzalez left the 63RD Street location to go work at the Graybar location because too much inappropriate activity was occurring at the 63RD Street location and he thought that the situation would be better at another club. *Id.* at 33:16-34-2)

56.     Plaintiff Gonzalez complained to his supervisor at the Graybar location, Eddie Rodriguez, about the sexual activities occurring in the club, and in response, Mr. Rodriguez "told management." (*Id.* at 35:19-25)

57.     Plaintiff Gonzalez discovered that the sexual activities were actually worse at Graybar, and decided to try the Wall Street location. *Id.* at 35:7-18.  He left the Wall Street location to work for more pay at the Greenwich location approximately one year later, but discovered that the sexual activities at the Greenwich location were even worse. *Id.* at 37:21-38:17.

58.     Plaintiff Gonzalez left the Greenwich location to be an assistant manager and pool operator at the newly opening Columbus Circle location. (*Id.* at 38:3-12).  While he was employed at the Columbus Circle location, plaintiff Mass was plaintiff Gonzalez's supervisor and defendant Denise Dronsick (formerly Berg) was the General Manager. *Id.* at 39:2-8.

59.     Plaintiff Gonzalez complained to his supervisor, plaintiff Mass, continuously and to Ms. Dronsick at least once about sex and members masturbating in the men's sauna. (*Id.* at 44:9-21).  Plaintiff Gonzalez complained to defendant Dronsick about the member masturbating. *Id.* at 44:22-45:7.   Defendant Dronsick's response was "she would take care of it." *Id.* at 45:20-24.

60.     Although defendant Dronsick said that she would take care of the problem, the sexual activities continued, and "kept happening all the time." (*Id.* at 46:3-18).

61.     At the 63RD Street location, plaintiff Gonzalez was forced to witness men fondling each other, (*Id.* at 54:8-18, 60:6-10), and men having anal sex, *Id.* at 57:13-58:11, "over and over." *Id.* at 62:7-8.  Plaintiff Gonzalez complained to his manager immediately every single time that he witnessed something inappropriate. (*Id.* at 65:7-18)

62.     On at least two occasions at the 63RD Street location, Eddie
Rodriguez took members aside that plaintiff Freddie Gonzalez had witnessed
masturbating and performing oral sex but plaintiff Gonzalez witnessed the same members
back in the club afterward. *Id.* at 60:6-61:22, 65:19-67:7.

63.     At the Graybar location, plaintiff Gonzalez witnessed masturbation
and oral sex in the men's locker room every single day because part of his job was to
check on the cleanliness of the men's locker room facilities. *Id.* at 63:23-71:14.

64.     At the Wall Street location, plaintiff Gonzalez witnessed men
having anal sex in the Jacuzzi. *Id.* at 71:20-72:5.

65.     At the Greenwich location, plaintiff Gonzalez witnessed men
having oral sex and masturbating all the time. *Id.* at 75:6-13 and 77:3.  Plaintiff
complained to his supervisor, George, and George told plaintiff that "he'll take care of
it." *Id.* at 75:15-18.  The oral sex continued to happen, *Id.* at 75:21, and plaintiff Gonzalez
continued to see the offending members inside the club. *Id.* at 76:3-16.

66.     Plaintiff Gonzalez eventually quit his job at Equinox because he
couldn't take the inappropriate sexual activities anymore.  *Id.* at 99-100.

67.     Plaintiff Guishard complained to defendant Berg about the sexual
activities going on in the men's locker rooms "every chance [he] got." (Dep. Jason
Guishard, ("Guishard Dep.") 41:19, excerpt from which are annexed to the Kurshan Decl.
as Exhibit 7 at 46:7-22).  Plaintiff Guishard complained to Ms. Dronsick approximately
five times. *Id.* at 47:1-19.

68.     Plaintiff Guishard complained to Alex Mass when he witnessed
sexual activities going on in the men's locker rooms. (*Id.* at 56:4-57:9).  He witnessed

8

anal sex and oral sex in the steam room, *Id.* at 63:16-64:20, and witnessed masturbation in the sauna. *Id.* at 76:3-13.

69.     Plaintiff Guishard was required to clean up condoms, bloody towels, and feces in the sauna and steam rooms. (*Id.* at 79:15-81:17). He quit working for Equinox in May 2005 because he was tired of witnessing inappropriate sexual activities. *Id.* at 88.

70.     Plaintiff Jaisiin Bethea complained every day about the sex in the steam room, masturbation and other inappropriate activities. Deposition transcript of Jaisiin Bethea ("Bethea Dep."), excerpts from which are annexed to the Kurshan Decl. as Exhibit 8, at 49:3-22. He would observe men fondling each other, masturbating and grabbing each other on a daily basis in the locker room. *Id.* at 77:9-24. He would see men groping and grabbing each other on the "butt" while walking past. *Id.* at 78:3-18. He also saw men fondling each other when they were in and came out of the steam room and it was not just one person but many men on numerous occasions such that he called it a "masturbation clinic." *Id.* at 82:6 – 83:12.

71.     The sexual activities continued, *Id.* at 76:11-21, including "men walking around with erections coming out of the steam room, Guys going into the steam room, going in with towels, coming out with absolutely nothing on." *Id.* at 86:7-11.

72.     There was one incident when Jaisiin, who is African American, walked in on a group of men in the sauna who were masturbating and a member "jumped in his face," and he was called the "n-word" "nigger basically." *Id.* at 93:8-17 and 95:14-23.

73.      He had to clean up condoms, blood in the steam room and in the sauna on the sitting areas from the sexual activities.  There was no reason that blood should be in the steam and sauna but for inappropriate activities. *Id.* at 98:14-18 and 99:9-25 to 100: 7.

74.      Plaintiff Bethea saw the same members who were involved in the sexual activities come back and continue to use the locker room facilities—"the situation just keeps continuing." *Id.* at 107: 9-23. Plaintiffs were compelled to be continually exposed to the same sexual activities. *Id.* at 110:8-13.  Perpetrators of the sexual activities had "lookouts." *Id.* at 110:23 -111:15.

75.      Plaintiff Bethea quit because he had been cursed at and disrespected for the last time when a member said "f you" and he was being "disrespected by these same members coming in here doing these things." *Id.* at 119:19 – 121:2 and 122:8 – 123: 5.  He felt degraded and received no respect even though he would have to give up his $6 per hour wage. *Id.* at 121:7-25.

76.      Plaintiff Alex Mass was called in by defendant because a female employee had complained about him. Deposition Transcript of Alex Mass ("Mass Dep.") at 100:23 – 103:13, Excerpts from which are annexed to the Kurshan Decl. as Exhibit 1. He believed that the situation involving sexual activities would have been handled differently if women were complaining because when a woman complained about him he was called by human resources and there was a meeting, notes were taken and a full investigation was commenced.   *Id.* at 197:23 - 198: 20.  See also Exhibit 4 to Kurshan Decl.

77.    Plaintiff Mass discussed sexual activities in facilities with David Harris, a national director of defendants, in 2004. *Id.* at 119:24 – 121:8.

78.    Plaintiff Mass spoke to Chris Usiak, also a national director (of sales) about Craigslist postings and that the sexual activities do not stop. *Id.* at 121:14 – 122:10.

79.    According to plaintiff Mass there were persons using the facilities who were not members and who did not sign a membership agreement. *Id.* at 132:4-7. Mass was told not to call the police. *Id.* at 141:11-13. He found the behavior of the members as permitted by defendants to be harassing as he had to watch individuals exposing themselves and exhibitioning to others. It was harassing and intimidating. He was uncomfortable. *Id.* at 151:23 – 152:24.

80.    Plaintiff Mass' job description did not include his having to encounter sexual behavior. *Id.* at 167:12-17.

81.    Plaintiff Mass complained every single day about the fact that he saw people masturbating. *Id.* at 307:4-7.

82.    Plaintiff Omar Harris when asked what Equinox should have done to stop the sexual activities said that they should have closed down the sauna and steam room and posted signs that inappropriate behavior would result in termination. See Deposition Transcript of Omar Harris ("Harris Dep.") at 38:7 to 39: 21, excerpts from which are annexed to the Kurshan Decl. as Exhibit 9.  He saw the same people day after day, even those that had previously been reported for inappropriate sexual activities. *Id.* at 40:13 – 41: 20.  He would see the same person masturbating again. *Id.* at 42: 10-21. As part of his job he would clean and pick up towels and he would observe somebody

stalking another person, guys massaging each other while naked, guys groping and fondling each other as he was trying to place towels in the sauna, in addition to having to observe oral sex. *Id.* at 43:9-14.

83.     Defendant Berg knew that a work environment which was hostile was where an employee feels that they are being threatened and not comfortable coming to work (Deposition Transcript of Denise Berg ("Berg Dep.") at 50:24 – 51:9, excerpts from which are annexed to the Kurshan Decl. as Exhibit 10).

84.     Defendant Berg could not recall any training in either addressing or dealing with complaints of harassment or discrimination (*Id.* at 55:2-9).

85.     Defendant Berg recalled that when female employee Jeanette Cortoreal made a harassment complaint about plaintiff Mass workplace (*Id.* at 58:6-14), that complaint would have to go to human resources, *Id.* at 63:5-16. See also, Exhibit 4 to Kurshan Decl. which is the documentation of such complaint and meetings had regarding such complaint, albeit by a female employee.

86.     The complaints by plaintiffs about sexual harassment were not sent to human resources. Herbert Dep. at 136:4-12.

87.     Sexual activities were supposed to be prohibited in all facilities. Berg Dep. at 69:3-15.  Sex in any facility is not supposed to be tolerated and thus it is not contemplated that the duties to be performed by any employee will expose him or her to such activities.  *Id.* at 112:21 to 113:16.

88.     A complaint of harassment, discrimination or hostile work environment is supposed to be met with a zero tolerance policy and that policy is

contained in the employee handbook. *Id.* at 69:19 to 70:6.  The procedure to investigate is to first get human resources involved.  *Id.* at 70:7-15 and 72:7-9.

89.     Defendant Berg did not know when a sign in the steam room about inappropriate behavior being prohibited was placed there, *Id.* at 133:13-18, and she does not think that it was up in 2004 and 2005. *Id.* at 133:19-25.  Defendants' former vice president of human resources who claimed to have used the facilities multiple times per week could not recall nor identify any signs prohibiting sexual behavior in the locker rooms.  See Deposition Transcript of Joel Greengrass ("Greengrass Dep.") at 101-104, excerpts from which are annexed to the Kurshan Decl. as Exhibit 11.

90.     Defendant Berg was aware of the many postings on Craigslist for meetings at Equinox facilities to engage in sexual activities, but she did not have someone check it out. Berg Dep. at 141:12-24 and 143:7, nor did anyone else at Equinox instruct employees to monitor Craigslist.  *Id.* at 143:8-12. Berg never arranged for someone to be at a location for sex advertised on Craigslist *Id.* at 144: 2-7.  See also Craigslist listings, Exhibit 12 to Kurshan Decl.

91.     Defendant Berg never considered any alternative or other solutions to eradicating the sexual activities in the facilities.  *Id.* at 199-200.

92.     Jeff Boyer ("Boyer") was employed by defendants as the Assistant General Manager/operations manager at Columbus Circle in 2004 and 2005 (Transcript of Deposition of Jeff Boyer ("Boyer Dep.") at 31:16-19, Exhibit 13 to Kurshan Decl.

93.     Boyer  believed that it was a good idea to put up signs that said "inappropriate behavior is unacceptable"  but Equinox would not because defendants would "'never want to give anyone the impression that there would be any inappropriate

behavior going on in their facilities'." *Id.* at 24:23 to 25:3. Boyer spoke with plaintiff
Mass about ways to address inappropriate sexual behavior but anything that was
recommended by plaintiff Mass was rejected because Equinox did not want to advertise
with signs to members that this was taking place: "They need to make money which
means they have to sell memberships and if there's inappropriate [male sexual] behavior
going on it will deter people from joining the club . . . ." (*Id.* at 43:21-25).

94.     Management meetings took place every Monday with all club
managers. At those meeting inappropriate sexual behavior among males was discussed.
*Id.* at 36:17-37:8. Boyer would hear about inappropriate sexual activities by male
members multiple times per week. *Id.* at 40:4-8. Boyer discussed inappropriate sexual
behavior by men with defendant Berg almost everyday and he also spoke to Chris Usiak,
defendants' sales/corporate manager (*Id.* at 42:9-12; 68: 17-18 and Herbert Dep. at
192:8).

95.     Berg rejected putting up a sign. *Id.* at 48:3-5. Closing the sauna
and steam was ruled out. *Id.* at 49:19-50:9.

96.     Given the nature of the problem and the nature of the people who
used the club the sexual activity problem could not be stopped,  and the inappropriate
sexual activities which were offensive, degrading and pornographic, *Id.* at 56:20 to 57:4,
continued until the day Boyer left Equinox, *Id.* at 51:9-24.

97.     Defendants were not going to take any action to produce unwanted
publication. *Id.* at 63:22-23. The situation, if publicized, was not good for business. *Id.* at
64. It was understood and accepted that defendants had rejected any ideas to address the
sexual behavior problem because it would hurt sales and highlight the problem. *Id.* at 65.

98.     The term "inappropriate behavior" when used on Equinox cancellation forms (Exhibit N to Bloom Aff.) meant 9 out of 10 times, inappropriate sexual behavior. Boyer Dep. at 106:5-8 and Berg Dep. at 97.

99.     Plaintiff's Exhibit 5 is a document prepared as a result of an investigation (Deposition of Matthew Herbert, Deposition of Matthew Herbert, ("Herbert Dep.") excerpts from which are annexed as Exhibit 3 to Kurshan Decl.). Herbert Dep. at 68:19) and specifically an investigation to discuss harassment claims by a female employee against plaintiff Mass. (*Id.* at 75:20). As part of the investigation there was a recommendation made by human resources as Mass' employment. *Id.* at 78. The investigation practice of Equinox was to have a person take notes of the meetings that were conducted to review the harassment allegations by the female employee. *Id.* at 75-78.

100.    It was defendants' practice to discuss with club managers harassment issues involving employees. Managers are trained to contact human resources immediately if there is a complaint of harassment. Herbert Dep. at 87:8. "We would talk to the person being accused. We would talk to the person who felt that they were harassed. We would talk to any witnesses that were involved." *Id.* at 87:15-18. All investigations, like the one involving the complaint against plaintiff Mass, are reduced to writing. *Id.* at 88:6-13. Equinox's procedure was that if an employee complained of being harassed, that would be brought to the attention of human resources. (129:6-8 and 130:15-131.6.)

101.    There were no memoranda, emails or correspondence regarding inappropriate sexual behavior or the complaints of plaintiffs. (*Id.* at 136:4-12)

Dated: December 3, 2007

Herzfeld & Rubin, P.C.
Attorneys for Plaintiffs

By:_____
Peter J. Kurshan (PK-6496)
40 Wall Street
New York, New York 10005
212-471-8500

To:

Allan S. Bloom (AB-4125)
Jennifer L. Bartle (JB-3589)
Paul, Hastings, Janofsky & Walker LLP
75 East 55th Street
New York, New York  10022
(212) 318-6000
Attorneys for Defendants